FILED
2013 Jul-26 PM 02:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DORIS W. MAY,                        }
                                     }
        Plaintiff,                   }
                                     }        CIVIL ACTION NO.
v.                                   }        11-AR-1923-S
                                     }
AT&T INTEGRATED DISABILITY,          }
AT&T CORPORATION, AND                }
SEDGWICK CLAIMS MANAGEMENT,          }
INC.,                                }
                                     }
        Defendants.                  }


**MEMORANDUM OPINION**

All claims brought by plaintiff, Doris W. May ("Ms. May"), against defendants, AT&T Integrated Disability, AT&T Corporation, and Sedgwick Claims Management Services, Inc. ("Sedgwick"), except her claim against Sedgwick under 29 U.S.C. § § 1001, *et seq*. ("ERISA"), have previously been dismissed. This leaves for consideration only Ms. May's ERISA claim against Sedgwick for alleged wrongful denial of short-term disability benefits. The case was originally assigned to a magistrate judge to whom the parties did not concede full jurisdiction.

This court continues to criticize the use of Rule 56, F.R.Civ.P., for deciding ERISA disability cases, but acknowledges that Sedgwick was following well recognized routine when it filed a Rule 56 motion challenging Ms. May's ERISA claims. The magistrate judge entered a report and recommendation ("R&R"),

1

recommending that Sedgwick's motion be granted, and that Ms. May's ERISA claims be dismissed.  The R&R, insofar as it addressed the ERISA claims, is set forth below *in haec verba*.  The emphasis on the word "**merely**" was placed on that word by the magistrate judge. He emphasized no other word.

### Plaintiff's ERISA Claims

Plaintiff alleges that defendant Sedgwick violated her rights under ERISA by improperly denying her Short-Term Disability benefits under AT&T Services, Inc.'s, STD Plan.  To determine whether plaintiff was improperly denied benefits under ERISA, the court must apply the six-step test set forth in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004).  *Blankenship v. Metropolitan Life Insurance Company*, 644 F.3d 1350, 1354-55 (11th Cir. 2011); *Eldridge v. Wachovia Corporation Long-Term Disability Plan*, No. 06-12193, 2007 WL 117712, at *1 (11th Cir. 2007).  The *Williams* test is as follows:

(1) The court must apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then the inquiry ends and the decision is affirmed.

(2) If the administrator's decision is, in fact, "de novo wrong," then the court must determine whether the administrator was vested with discretion in reviewing claims; if not, the inquiry ends the decision is reversed.

(3) If the administrator's decision is "de novo wrong" and he was vested with

discretion in reviewing claims, the court
must determine whether "reasonable" grounds
supported the decision (hence, the court
must review the decision under the more
deferential arbitrary and capricious
standard).

(4) If no reasonable grounds exist for the
decision, the inquiry ends and the court
must reverse the administrator's decision;
if reasonable grounds do exist, the court
must determine whether the administrator
operated under a conflict of interest.

(5) If there is no conflict of interest, the
inquiry ends and the court must affirm the
administrator's decision.

(6) If there is a conflict of interest, the
conflict should **merely** be a factor for the
court to take into account when determining
whether an administrator's decision was
arbitrary and capricious. (emphasis
added).

*Blankenship*, 644 F.3d at 1355. A pertinent

conflict of interest exists when the plan administrator

both makes eligibility decisions and pays awarded

benefits out of its own funds. *Id.* Where a conflict

exists and the court must reach step six, the burden is

on plaintiff to show that the administrator's decision

was tainted by self-interest. *Id.* Even where a

conflict exists, the court still owes deference to the

administrator's discretionary decision-making as a

whole. *Id.*

First, the court must determine whether the

administrator's decision was "de novo wrong" under the

*Williams* test. The court finds that defendant

Sedgwick's decision denying benefits to plaintiff for

certain periods of time was not *de novo* wrong. Under

3

the Plan, entitlement to STD benefits depended on having a medical condition supported by objective medical evidence that made a participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. "Any type of work" includes the participant's regular job with or without accommodations, any other company job with or without accommodations, or temporary modified duties. (Doc. 30-4 Ex. A ¶ 2.10).

Defendant Sedgwick denied plaintiff benefits for the periods at issue because her treating physicians did not produce the requisite objective examination materials supporting a conclusion that plaintiff was disabled under the Plan. Further, upon both a first-level and a second-level appeal from these conclusions, independent medical examiners opined that the medical conditions described in plaintiff's records did not support the conclusion that she was unable to perform the sedentary work associated with her job.

The first denial of STD benefits was for the period of May 24 to June 15, 2010. At that time, plaintiff's condition was described as being a cervical radiculopathy and cervical spondylosis. Although plaintiff was hospitalized for a few days after May 17, by May 24 she was out of the hospital and receiving treatment from Dr. Thomas Wilson. In an Attending Physician's Statement dated June 6, 2010, Dr. Wilson reported that plaintiff was being treated with epidural blocks and "will be off work day of block and day after

4

block." (Doc. 30-6, DEF 000084). This plainly implies that, but for the day of and the day after an epidural block, plaintiff was capable of working and not disabled. The epidural block occurred on June 16, and plaintiff was awarded STD for that day and day after (June 17). The decision to deny STD benefits from May 24 to June 15 was not wrong.

The next period of time for which plaintiff sought STD benefits was from June 21 to July 15, 2010. After plaintiff returned to work on June 18, she remained only four hours and left, and she did not return to work on the next scheduled work day. As a result, she was deemed to have had a relapse of the condition involved in her previous period of STD and a new claim for STD was started on June 21. (Doc. 30-8, DEF 000281). On June 24, plaintiff was diagnosed with a ruptured and herniated cervical disc, and she was scheduled for corrective surgery on July 16, 2010. In an Attending Physician's Statement by Dr. Carter Morris on July 1, 2010, Dr. Morris reported his findings of a herniated cervical disc, with surgery scheduled for July 16. The only work restriction he reported at that time was "No working during post op recovery period." (Doc. 30-10, DEF 000465). Five days later, however, Dr. Morris wrote a letter "To Whom It May Concern," saying "For Medical reasons, please excuse the above-named employee from work prior to her surgery." (Doc. 30-10, DEF 000467). In another letter dated July 8, Dr. Morris again requested that plaintiff be excused prior to surgery

5

because "Work exacerbates pain." (Doc. 30-10, DEF 00469). Nevertheless, two medical advisors, Dr. Mickle and Dr. Lewis, reviewed plaintiff's records, and both concluded that plaintiff was capable of working with restrictions in the preoperative time frame of June 21 to July 15, 2010. (Doc. 30-10, DEF 000484 and DEF 000487-488).

The court agrees that there was no objective medical evidence presented as to why plaintiff was incapable of working prior to her surgery on July 16. While Dr. Morris wrote at least two work excuses for plaintiff, his only explanation was that "Work exacerbates pain." There was no objective medical evidence of disability in that, as Drs. Mickle and Lewis noted, the plaintiff's medical records indicated that she had no loss of range of motion, strength, or dexterity. These objective findings counter the contention that plaintiff was incapable of working with appropriate restrictions to reduce her pain. Thus, the decision by Sedgwick that plaintiff was not entitled to STD from May 21 to June 15 was not wrong.

The third and final time period plaintiff claims she was improperly denied STD benefits was from November 15, 2010, to May 9, 2011, except for three two-day periods when she received epidural blocks and was granted STD benefits. As noted earlier, plaintiff's own treating physicians, Dr. Morris and Dr. Leong, both cleared her to return to work without restrictions, beginning November 15, 2010. (Doc. 30-14, DEF 000776-

6

000777; DEF 000792; Doc. 30-15, DEF 000857). Furthermore, an independent medical reviewer, Dr. Levy, opined also that plaintiff was able to return to work by November 15. (Doc. 30-15, DEF 000866). Although plaintiff continued to suffer neck pain, for which she received three epidural blocks, there simply is no medical evidence that plaintiff was incapable of working at a sedentary job after November 15. Sedgwick's decision to deny STD benefits after November 15 was not wrong.

Plaintiff's reliance on *Lee v. BellSouth Telecommunications, Inc.*, 318 Fed. Appx. 829 (11th Cir. 2009) is misplaced. *Lee* is a case dealing with a diagnosis of "chronic pain syndrome," a fundamentally different diagnosis than plaintiff's. It is in cases involving this diagnosis of chronic pain syndrome, and not cases involving general pain accompanying a diagnosis of a distinct medical condition, that it is unreasonable for a plan administrator to ignore both objective and subjective medical evidence submitted by the plaintiff. *Lee*, 318 Fed. Appx. at 837. Plaintiff mischaracterizes the *Lee* holding as applying to all cases involving chronic pain when, in fact, the holding applies only to cases involving a diagnosis of chronic pain syndrome, a diagnosis which inherently relies upon subjective evidence of pain. *Id.* Furthermore, in *Lee*, the court noted that there is no objective laboratory test for diagnosing chronic pain syndrome. *Id.* The same cannot be said of plaintiff's diagnoses of cervical

radiculopathy, cervical spondylosis, ruptured and herniated cervical disc, and ischemic stroke. Plaintiff's range of motion and strength tests indicated essentially normal function, and the X-rays of her neck after surgery revealed a successful fusion of the C6-7 vertebrae. The objective medical evidence did not reveal a condition so debilitating as to make plaintiff disabled.

Moving to the second step in the *Williams* process, even if the court found that defendant Sedgwick's decision to deny plaintiff STD benefits for certain periods of time was *de novo* wrong, that would not end the inquiry because Sedgwick was vested with discretionary authority. The Plan explains that Sedgwick, as claims administrator, has complete discretionary authority to determine whether benefits are approved under the Plan and to interpret the terms and provisions of the Plan pertaining to STD benefits. (Doc. 30-4 ¶ 4-5). Thus, once the second step of the *Williams* test is reached, the arbitrary and capricious standard of review applies.

Now that the court has found that Sedgwick was vested with discretionary authority under the Plan, the third step of the *Williams* test requires the court to determine whether reasonable grounds existed for Sedgwick's denial decision under the arbitrary and capricious standard. At this stage, the court's role is limited to a determination of whether Sedgwick's decision was made rationally in good faith and not

whether it was right; Sedgwick's decision need not be
the best possible decision, only one with a rational
justification. *Guy v. Southeastern Iron Workers'
Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989); *Griffis
v. Delta Family-Care Disability Plan*, 723 F.2d 822, 825
(11th Cir. 1984). Furthermore, the court cannot require
Sedgwick to accord more weight to the opinions of
plaintiff's treating physicians, nor may the court
impose upon Sedgwick a burden of explanation because it
credited reliable evidence that conflicts with treating
physicians' evaluations. *Black & Decker Disability Plan
v. Nord*, 538 U.S. 822, 834 (2003). A plan administrator
may give different weight to the opinions of treating
physicians over those of independent physicians employed
by defendants without acting arbitrarily and
capriciously. [These sources should be reversed.]
*Blankenship*, 644 F.3d at 1356.        During plaintiff's
first claim for disability benefits, after all appeals
were exhausted, Sedgwick denied STD benefits to
plaintiff for the period from May 24, 2010 to June 15,
2010. (Doc. 30-7, DEF 000191-000192). On first-level
appeal, in upholding the denial of plaintiff's benefits
between May 24 and June 15 of 2010, Sedgwick relied on
the reports of medical doctors, J. Parker Mickle and
Jamie Lee Lewis. (Doc 30-6, DEF 000113, 000138-000144).
The stated reason for the denials was that the medical
information received did not provide enough objective
documentation to substantiate a finding that plaintiff
was totally disabled for the denial periods. (DEF

9

000113).   The denial was upheld on second-level appeal after plaintiff's medical records were reviewed by doctors Imad Shahhal and Howard Grattan.  (Doc. 30-7, DEF 000179-000185).   These doctors reported that plaintiff's records did not present evidence that she was unable to perform a sedentary job for the denial periods.  *Id.*  Plainly, Sedgwick had a rational and good faith basis for exercising its discretion to deny STD payments to plaintiff during this period of time.

During plaintiff's second claim for disability benefits, after all appeals were exhausted, Sedgwick denied benefits to plaintiff for the period from June 21, 2010 to July 15, 2010.  (Doc. 30-4 ¶ 8).  Dr. Shahhal and Dr. Grattan again reviewed plaintiff's medical records on second-level appeal.  (Doc 30-7, DEF 000191-000192).   They concluded that nothing in the records indicated that plaintiff was unable to perform a sedentary job between June 21 and July 15 of 2010. *Id.*   This also was a rational basis for exercising discretion to deny STD payments to the plaintiff.

Finally, during plaintiff's third claim for benefits, after all appeals were exhausted, Sedgwick denied disability benefits, except for three two-days periods when plaintiff received epidural blocks, for the entire period from November 11/16/2010, to May 9, 2011. Her medical records were examined on appeal by Dr. Michael T. Levy, Dr. J. Parker Mickle, and Dr. Charles Brock.  (Doc. 30-13, DEF 000717-000719; Doc. 30-15, 000919-000925).   Again, these doctors reported that,

10

based on her medical records, plaintiff was capable of performing her normal sedentary job during the denial periods. *Id.* These were a rational basis for doing so.

Plaintiff argues that defendants and the peer reviewers ignored the findings of her treating physicians and the independent medical examiner, Dr. Cezayirli. She relies on the statements of her treating doctors that, during the relevant periods, she could not bend or stoop, sit or stand for prolonged periods, lift over ten pounds, and could only work for four hers per day. (Doc. 30-8, DEF 000240; Doc. 30-11, DEF 000532). She further relies on Dr. Cezayirli's statements that plaintiff, during the relevant periods, was unable to "return to a sitting position in one position working at a computer terminal until January 1, 2011." (Doc. 30-11, DEF 000537). However, the evidence on file shows that plaintiff, while performing her job duties as a service representative, was not required to be seated in her chair continuously; she was able to get up, walk around, and come back to her desk at any point throughout the day. (Doc. 30-3 ¶ 7). Plaintiff does not dispute this. Further, her job did not require any heavy lifting. (Doc. 30-1, 15). Thus, had she returned to work during the denial periods, the evidence shows that plaintiff would not have been required to sit or stand for prolonged periods nor lift over ten pounds. Most importantly, that she was allowed to stand up and walk around at any time during the day means that she would not have been required to sit in one position at

a computer had she returned to work during the denial periods.

    While defendant Sedgwick's decision to deny plaintiff benefits during the relevant time periods may not have been the correct or best decision, the court cannot find that, given the evidence, it was unreasonable.  However, as noted, the court does not find that Sedgwick's decision was *de novo* wrong.  Because the court finds that defendant Sedgwick's denial of benefits to plaintiff over certain periods of time was not *de novo* wrong and, even if it was, the decision to deny benefits was reasonable under the *Williams* test, defendants are entitled to summary judgment as to plaintiff's ERISA claim.

Because Ms. May timely filed objections to the R&R, the court is obliged to consider Sedgwick's motion for summary judgment *de novo*, and to accord the R&R no deference, treating it only as a high quality brief *amicus curiae* on behalf of Sedgwick.  There are several intriguing, provocative, and unique aspects to this case.

The first and foremost unique aspect is the fact that Ms. May only sought short-term disability benefits and was denied them only for portions of the short terms for which she applied.  This does not mean, of course, that she does not have the right to seek judicial relief to recover money she claims to have been wrongfully denied her, plus, of course, attorneys' fees attributable to the denial if in violation of ERISA.  However, this court has never

before been called upon to rule on ERISA liability for a series of
"off-and-on" or intermittent periods of short-term disability.  It
is apparent from the record that Sedgwick responded to Ms. May's
relatively small claims just as vigorously and with just as much
adversarial zeal as if they had been a single monumental long-term
disability claim, something that these three claims might well have
become if Ms. May had presented an LTD claim.  Ms. May, who was *pro
se* during the claims process, was hopelessly out-classed.  In this
instance, David could not slay a well-armed Goliath.  Sedgwick,
which admittedly was the ERISA claims fiduciary, demonstrated more
loyalty to the funding entity which had employed it, than to its
*cestui que trust* during the administrative process.  Sedgwick
jealously guarded its client's money.  This is one of the most
bothersome aspects not only of this case, but of ERISA benefits
cases in general.  Ms. May was faced with the unenviable task of
separately appealing to a conflicted judge each of the judge's
three short-term denials.  She hit a stone wall each time.

A second noteworthy and equally bothersome feature of this
case arises from the fact that Ms. May, because she was obligated
to do so by the terms of the Plan, applied to the Social Security
Administration ("SSA") for disability benefits.  After being denied
by SSA, she appealed.  Her SSA appeal was pending when the
magistrate judge issued his R&R.  Between the time the R&R was
entered and Ms. May's objections were filed, the SSA granted Ms.

13

May's appeal and impressively found that she was totally disabled as of May 16, 2010, and from that time forward she lacked the capacity to perform any job whatsoever.   The time period of Ms. May's disability, as determined by the SSA, embraces all three of the time periods investigated by Sedgwick and considered by the magistrate judge.   Because the SSA finding was not in the "administrative record", it was not considered by the magistrate judge, who agreed with Sedgwick that Ms. May was not disabled during the periods for which she had been denied short-term benefits.   Ms. May now insists that the SSA finding be considered by this court and heavily weighed in her favor, both in evaluating *de novo* the R&R, and in evaluating the Sedgwick denials, whether *de novo* or with the deference that automatically follows the fact that Sedgwick was granted discretionary authority to interpret the Plan and to rule dispositively on claims.

    Not unexpectedly, Sedgwick moves to strike the SSA finding, and to limit this court's review of the R&R to the "administrative record", namely, the materials that were before Sedgwick and before the magistrate judge, both of whom knew of Ms. May's pending SSA appeal when they reached their respective identical conclusions. Neither Ms. May nor Sedgwick has cited any case on all fours with a case having the sequence of events of this case.   The court is faced with a *sui generis* situation.   What is the court to do with the belated SSA finding under these procedural circumstances?

In Sedgwick's original brief to the magistrate judge in support of its motion for summary judgment, it argued:

> Another interesting fact about May's claims under the ADA and Rehabilitation Act is that she testified that she has applied for Social Security Disability Benefits. (May Depo., p. 19). May's initial request for Social Security Disability Benefits was denied, and she has appealed that denial. (May Depo., p. 19). May's appeal remains pending. (May Depo., p. 20). As stated by the Eleventh Circuit, "to obtain Social Security Disability Benefits, an applicant must prove he is disabled." Kurzweg v. SCP Distributors, LLC, 424 Fed. Appx. 840, 843, 2011 U.S. App. LEXIS 8281, 24 Am. Disability Cas. (BNA) 1555 (11th Cir. 2011), citing Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). For purposes of obtaining Social Security Disability Benefits,
>
>> A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."
>
> Kurzweg, 424 Fed. Appx. At 843.

The SSA disability standard is correctly outlined by Sedgwick. If the SSA finding is given the weight some courts give it in ERISA disability cases, there is a strong basis for Ms. May's following argument:

> May has now been determined to be fully disabled by the Social Security Administration. This determination was made after all briefing was completed. Usually such a determination will require remand to the Plan Administrator, but in this case, considering that the

15

> District Court reviews *de novo* (*Moon v. Am. Home*, 888
> F.2d 86, 89 (11th Cir. 1989) a remand is unnecessary
> since any determination by the Plan Administrator, when
> considering the Administrative Record as a whole along
> with this new determination of disability, that May is
> not disabled and not entitled to benefits would be
> arbitrary and capricious.  This is especially true
> considering the strong and broad language used by the
> Administrative Law Judge and the determination that no
> job is available to May nationwide.

Ms. May's opposition to a remand to the plan administrator is an entirely reasonable position for Ms. May to take in light of the virtually universal experience by ERISA claimants that reconsideration by an inherently conflicted plan administrator is rarely, if ever, worthwhile.  It is not only expensive and time consuming, but it only challenges the conflicted decision-maker to find a new, if sophistic, reason for reaching the same conclusion it reached earlier.  What are lawyers and "independent" medical opiners for?

Sedgwick, itself, is careful not to mention the remand option. Instead, it places its eggs in the basket of eliminating from consideration entirely the SSA determination and Ms. May's affidavit that accompanies it.  Sedgwick and its lawyers would have to test their forensic abilities if they had to deal with the SSA finding.

On more than one occasion, this court has expressed its disagreement with what this court believes to be the Eleventh Circuit's badly flawed, and highly peculiar way of responding to the instructions laid down by the Supreme Court in *Metropolitan*

16

*Life v. Glenn*, 128 U.S. 2343 (2008). Yet, this court is unwilling to repeat unsuccessful arguments that have fallen on deaf ears. The Eleventh Circuit made its positions abundantly clear in *Blankenship v. Metropolitan Life*, 644 F.3d 135 (11th Cir. 2011). Shortly thereafter, in *Ray v. Sun Life*, 443 Fed. Appx 529 (11th Cir. 2011), the Eleventh Circuit added reinforcement to the concrete that it had poured around its feet in *Blankenship*, by holding:

> Based on the administrative record available to Sun Life when it made its decision, *see Blankenship*, 644 F.3d at 1354 (**review of benefits denial is limited to consideration of the material available to the administrator at the time it made its decision**), we can not say that Sun Life's denial of benefits is *de novo* wrong. (emphasis added).

In *Ray*, the "administrative record" contained something not contained in the "administrative record" before the magistrate judge in the instant case, namely, an SSA finding of total disability. Despite this fact, Sun Life easily preferred the findings of its "two non-examining medical experts" over the findings of the treating physicians, and over the SSA determination. In *Ray*, the Eleventh Circuit elaborated its *Blankenship* positions with two pregnant sentences: (1) "No special weight is to be accorded the opinion of a treating physician"; and (2) "[W]hile approval of social security benefits may be considered, it is not conclusive on whether a claimant is also disabled under the terms of an ERISA plan." In *Ray*, the Eleventh

17

Circuit had no problem in agreeing with the lower court that Sun Life was not *de novo* wrong when it found no entitlement to benefits.

Not only does the Eleventh Circuit now give dispositive sanctity to the "administrative record", which is not to be tampered with or supplemented with new, albeit important and relevant evidentiary material, but if this court were to be so innovative and adventurous as to deny Sedgwick's motion to strike, and if Sedgwick were ordered to take another look at Ms. May's claims in light of the favorable SSA decision, Sedgwick could and probably would treat the SSA finding simply as something else to discount in comparison with its **"independent non-examining medical experts"**.   Assuming *arguendo* that this court has the power to remand the case to the Sedgwick briar patch, that briar patch is one in which Sedgwick is accustomed to navigate.

It is easy to detect that the magistrate judge was operating under what he realized are the severe constraints imposed by *Blankenship*.  Even if he had expended monumental effort, he could not have found a way around the Eleventh Circuit's multi-step framework for reviewing an ERISA denial.  No other circuit court of appeals in the United States has adopted the Eleventh Circuit's strange six step scheme.  The Eleventh Circuit stands starkly alone in its reading of *MetLife v. Glenn*.  One proof of the magistrate judge's complete understanding of the Eleventh Circuit is that he

places emphasis on the word **"mere"** employed by the Eleventh Circuit in its Step Six.  The magistrate judge never really arrived at Step Six in his analysis, because he found that Sedgwick's decision was not *de novo* wrong (was it *de novo* **right**?).  The magistrate judge avoided a need to consider whether Sedgwick's clear, but "mere", conflict-of-interest played a part in the denial decision.  The word "mere" rhymes with the word "sneer".  It is like saying "she has a mere case of terminal cancer."  After *Blankenship*, no district court within the Eleventh Circuit, and certainly not the Eleventh Circuit itself, has ever found that the inherent and inevitable conflict-of-interest recognized by the Supreme Court in *MetLife v. Glenn* is a serious factor that must always be considered as something that can be, and often is, sufficient to topple an otherwise justifiable denial decision.

Not only did the magistrate judge understand what "mere", as used by the Eleventh Circuit, means, but on several occasions he echoes the Eleventh Circuit's many affirmances of denials that were based on a lack of **"objective"** proof of disability, something the Eleventh Circuit, perhaps aberrantly, criticized in *Oliver v. Coca Cola Co.*, 497 F.3d 1187, 1196 (11th Cir. 2009), as follows:

> Coca-Cola based its rejection of Oliver's claim on its contention that Oliver failed to provide "objective evidence" of his disability, stating that the "true organic etiology" of Oliver's pain had not been determined. R3-61, Exh. 30.  Yet much medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured.

Indeed, the only evidence of a qualifying disability may be the sort of evidence that Coca-Cola and Broadspire characterize as "subjective", such a physical examination and medical reports by physicians, as well as the patient's own reports of his symptoms.

The Eleventh Circuit's Step Five and Step Six both begin with the word "**IF**": (5) "**IF**" there is no conflict...., and (6) "**IF** there is a conflict....." (emphasis added).  IF the Supreme Court in *MetLife v. Glenn* made nothing else clear, it made it absolutely clear that a conflict-of-interest **always** exists under circumstances like these, and that the conflict is a substantial factor that must be considered in evaluating wether the denial was arbitrary and capricious.  For a long period of time, the Eleventh Circuit found that some of the schemes and disguises used by ERISA decision-makers were sufficient to demonstrate that they operated without a conflict-of-interest.  Now that the ever-present conflict-of-interest cannot be explained away, the decision-makers no longer try to prove the non-existence of the conflict still theoretically recognized in Step Five.  The depreciation of the conflict-of-interest inherent in the use of the word "mere" allows the decision-maker happily to skip over Step Five and go straight to Step Six.  The word "IF" does not fit.  There is no "IF".  Although Sedgwick may argue that it itself is not obligated to pay benefits that the Plan may be obligated to pay to Ms. May, it is clear that its loyalty is to the owner of the pocket from which those benefits would be drawn.  If any proof were needed of the fact that for

ERISA purposes, Sedgwick is the *alter ego* of the funding entity, it is the fact that the decision-maker and the payor are represented by the same lawyers.  They are all in this together.

Without this court's considering the SSA determination, which will be separately stricken on Sedgwick's motion, this court respectfully disagrees with the magistrate judge's conclusion that Sedgwick's decision was not *de novo* wrong.  The magistrate judge is saying that if he had been the decision-maker, he would have reached the same conclusion that was reached by Sedgwick.  Upon a *de novo* review limited to the "administrative record", this court finds that Sedgwick's decision was "*de novo* wrong", and if that were the end of the inquiry, this court would have granted Ms. May's claims for short-term benefits.  This court is just as qualified as Sedgwick, if not more so, to make necessary credibility determinations without the opportunity to assess demeanor and the interests of the witnesses.  This court finds Ms. May believable and finds that she suffered from the debilitating pain she sought to have corrected by surgery.  Her claims were of such small amounts that they cannot suggest a motive for fraud or mispresentation.  No sane person would submit to two dangerous surgeries just to obtain small amounts of disability benefits.

In the last paragraph of the R&R, the magistrate judge, inconsistent with his finding that Step One was as far as he needed to go, said:

21

> [D]efendant Sedgwick's decision to deny plaintiff benefits during the relevant time periods **may not have been the correct or best decision**. (emphasis added).

In these words, the magistrate judge was expressing serious reservations about the correctness of a decision he had found to be correct. This court not only believes that Sedgwick's decision "may not have been correct", but that it was incorrect.

There is no purpose to be served by this court's writing a full scale opinion to show why Sedgwick was *de novo* wrong. Such an undertaking becomes academic in light of the rule enunciated in *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101 (1989), namely, that a self-interested entity, if granted discretion, can sit in judgment on the correctness of its own rulings, and that despite its glaring self-interest, it can be objective and fair to the ERISA beneficiary against whom it has an adversarial relationship. Perhaps some day the Supreme Court will recognize the "due process" implications in *Bruch.*

This court's quarrel with the Eleventh Circuit's ERISA regime cannot form a basis for ignoring binding precedent. Based on the "administrative record", this court agrees with the magistrate judge that it was not "unreasonable" for Sedgwick to prefer the opinions of its own hired physicians over the findings of Ms. May's treating physicians, who could not satisfy Sedgwick "objectively" that Ms. May's pain before surgery and during periods after surgery, was so disabling that she could not perform any job.

22

Further, because Sedgwick's obvious conflict-of-interest is a "mere" factor that can be discounted into virtual oblivion, this court defers to Sedgwick's exercise of the discretion which *Bruch* accorded it, and which the Eleventh Circuit magnified in *Blankenship*.

In *Blankenship*, the Eleventh Circuit went outside the "administrative record" to mention the fact that Metropolitan Life had such a big balance sheet that a disability claim of a "mere" $500,000 could not cause it to flinch from discharging its fiduciary obligation. While not understanding the Eleventh Circuit's departure from the "administrative record" in *Blankenship*, this court readily adopts the *Blankenship* idea for this case. Sedgwick should have had no hesitancy in dipping into AT&T's deep pocket when Ms. May was only seeking chump change.

This court respectfully declines Ms. May's invitation to be the first district court within the Eleventh Circuit to find that a "mere" conflict-of-interest tips the balance in favor of a disability claimant. There are many cases elsewhere in which the inherent conflict-of-interest tips the balance in favor of the plan beneficiary, but this court has found none in the Eleventh Circuit.

## Conclusion

This court commends to any reader of this opinion the penetrating article written by Marc Galanter, entitled "Why The 'Haves' Come Out Ahead: Speculations On The Limits Of Legal

23

Change", found at 9 Law & Soc'y Rev. 95 (1974).  The article grew
out of a seminar held at Yale Law School.  *Inter alia*, Professor
Galanter said:

> Most analyses of the legal system start at the rules end
> and work down through institutional facilities to see
> what effect the rules have on the parties.  I would like
> to reverse that procedure and look through the other end
> of the telescope.  Let's think about the different kinds
> of parties and the effect these differences might have on
> the way the system works.
>
> Because of differences in their size, differences in the
> state of the law, and differences in their resources,
> some of the actors in the society have many occasions to
> utilize the courts (in the broad sense) to make (or
> defend) claims; others do so only rarely.  We might
> divide our actors into those claimants who have only
> occasional recourse to the courts (**one-shotters** or OS)
> and **repeat players** (RP) who are engaged in many similar
> litigations over time.  (emphasis added).

Ms. May has only one ERISA case, this one.  Sedgwick, and other
professional claims administrators and insurers, have many cases
and are represented by highly competent lawyers who are well
trained in ERISA jurisprudence, which has mutated far away from
original Congressional intent.  The "one-shotters" cannot compete
with the "repeat players".

     This court's unsolicited advice to Ms. May is to forget the
possibility that her case will be the first case in the Eleventh
Circuit since *Blankenship* in which an adverse decision by a plan
administrator will be set aside as an abuse of discretion.  An
appeal by Ms. May would require the Eleventh Circuit to review *de
novo* this opinion, which has reviewed *de novo* the magistrate

24

judge's opinion, which, in turn, reviewed *de novo* Sedgwick's opinion.  If Ms. May does not take this court's advice, and if the Eleventh Circuit should find a way to commiserate with her in a more tangible way than this court has been able to do, this court's feelings will not be hurt.

By separate orders, the motions of Sedgwick to strike and for summary judgment will be granted.

DONE this 26th day of July, 2013.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE